STATE OF NORTH CAROLINA v. KEITH LAMAR BELLAMY AND LEON McCOY

No. COA04-550

(Filed 16 August 2005)

## 1. Robbery— dangerous weapon—taking property of individual and employer—one offense

The trial court erred by failing to dismiss one of the charges of robbery with a dangerous weapon against each defendant and the cases are remanded for resentencing, because the robbery of an individual of her own property and the property of her employer, occurring at the same time, constitutes only one offense of robbery with a dangerous weapon.

## 2. Sexual Offenses— first-degree—motion to dismiss—sufficiency of evidence—penetration

The trial court did not err by denying defendant's motion to dismiss the charge of first-degree sexual offense even though defendant contends there was insufficient evidence of penetration, because: (1) N.C.G.S. § 14-27.1(4) provides that a sexual act can be defined as penetration, however slight, by any object into the genital or anal opening of another person's body; (2) in the context of rape, our Supreme Court has held that evidence that defendant entered the labia is sufficient to prove the element of penetration, and the Court of Appeals finds no reason to establish a different standard for sexual offense; and (3) the evidence in the instant case shows that defendant used the barrel of his gun to spread the labia of the victim.

STATE v. BELLAMY

[172 N.C. App. 649 (2005)]

### 3. Evidence— surveillance video—probative value—authenti-cation—relevancy

The trial court did not err in a robbery with a dangerous weapon and first-degree sexual offense case by admitting into evidence a surveillance video from another store that faced in the direction of the pertinent store, because: (1) any argument that the video should have been excluded under N.C.G.S. § 8C-1, Rule 403 is not properly before the Court of Appeals when defendants did not object to the admission of the video at trial on the ground that its probative value was outweighed by its prejudicial effect and defendants did not argue on appeal that the prejudicial effect of the video amounted to plain error; (2) the State presented proper authentication under N.C.G.S. § 8C-1, Rule 901(a) including testimony establishing that the video recorder was in working order, that it was recording the night in question, that it was viewed the following day, that it had not been altered prior to trial, and that the chain of custody had not been broken; and (3) the video was relevant evidence potentially corroborating a witness's testimony and it was the province of the jury to determine what weight, if any, to give to the evidence.

### 4. Evidence— narrative of video shot—opinion testimony

The trial court did not err or commit plain error in a robbery with a dangerous weapon and first-degree sexual offense case by allowing a detective to narrate the video shot inside the store at the time of the crime and by allowing him to express his opinion regarding the significance of the events depicted, because: (1) assuming arguendo that it was error to allow the detective to nar-rate the video footage and that each instance of testimony defendants complain of constitutes improper opinion testimony, there was no prejudicial error in light of the substantial evidence of guilt; (2) nothing in the record indicates the Court of Appeals was required to consider the contested evidence cumulatively; (3) the Court of Appeals declined to treat defendants' sparse and sometimes unrelated objections in the instant case as a continu-ing objection to all the contested evidence; and (4) even assum-ing arguendo that each piece of testimony individually was improper, defendants have failed to show it was plain error.

### 5. Witnesses— vouching for credibility—plain error analysis

The trial court did not commit plain error in a robbery with a dangerous weapon and first-degree sexual offense case by

allowing a detective to vouch for a witness's credibility in his testimony, because: (1) assuming arguendo that the detective's testimony (that the video corroborated the witness's statements concerning his actions as he reentered the restaurant and that he believed the witness had been truthful in that particular testimony) was improper, it did not rise to the level of plain error when the detective explicitly testified that he had doubts about the witness and that he still considered the witness a suspect; and (2) assuming arguendo that the detective's three other contested statements were improperly admitted, they also did not rise to the level of plain error.

**6. Evidence— cash—ski masks**

The trial court did not commit plain error in a robbery with a dangerous weapon and first-degree sexual offense case by admitting over objection certain physical evidence at trial including $1,000 in cash found at one defendant's residence and two green ski masks found in such defendant's car, because assuming arguendo that the items were improperly admitted, defendants make no argument on appeal as to how the admission of these items of evidence has prejudiced them in any way.

**7. Appeal and Error— preservation of issues—limiting instruction**

Although defendant contends the trial court erred in a robbery with a dangerous weapon and first-degree sexual offense case by denying defendant's request that an instruction be given limiting the jury's consideration of evidence to the codefendant including $1,000 in cash found at the codefendant's residence and two green ski masks found in the codefendant's car, this issue has not been properly preserved because: (1) although defendant requested a limiting instruction with regard to the photograph of the two masks, he did not request such an instruction for the admission of the actual masks or the $1,000; and (2) defendant does not argue on appeal that the trial court committed plain error by failing to give a limiting instruction ex mero motu.

**8. Sexual Offenses— first-degree—failure to instruct on lesser-included offenses**

The trial court did not commit plain error by failing to instruct the jury on any lesser-included offenses of first-degree sexual offense including assault on a female and attempted first-degree sexual offense, because: (1) assault on a female is not a

lesser-included offense of first-degree sexual offense; and (2) where there is no evidence that the sexual offense was not accomplished, the court has no duty to instruct on an attempted sexual offense.

**9. Evidence— alleged false testimony—observations of videotape**

The trial court did not err in a robbery with a dangerous weapon and first-degree sexual offense case by failing to overturn defendant's convictions based on the State allegedly allowing a detective to give testimony involving his observations of the videotape evidence that it knew to be false without correcting the testimony, because: (1) where the judge, jury, and defendants all had the opportunity to view the video themselves, the possibility of misleading the jury is slight; (2) it is exceedingly unlikely that the State would intentionally proffer false evidence in a situation where the falsity of the evidence could be easily discovered; and (3) even assuming arguendo the testimony was false, defendant failed to show the evidence was material and knowingly and intentionally used by the State to obtain his conviction.

**10. Evidence— prior crimes or bad acts—preparation of photographic lineup**

The trial court did not err by permitting a detective to testify concerning the method he used to put together a photographic line-up containing a photograph of defendant even it this testimony may have allowed the jury to infer that defendant had a prior arrest.

**11. Sexual Offenses— first-degree—codefendant's act during robbery—acting in concert—sufficiency of evidence**

The trial court erred by denying defendant's motion to dismiss the charge of first-degree sexual offense committed during the course of a robbery of a fast food restaurant under the theory of acting in concert, because: (1) based on the facts of this case, a sex offense committed in the course of a robbery of a public business by a codefendant was not a natural or probable consequence of the robbery; and (2) a reasonable person in defendant's position would not have foreseen that the codefendant would take the time to deviate from the planned robbery to commit this type of bizarre sexual assault on the victim.

**12. Criminal Law— joinder of cases—motion to sever**

The trial court did not abuse its discretion in a robbery with a dangerous weapon and first-degree sexual offense case by joining defendant's cases for trial with those of a codefendant and by denying defendant's motion to sever, because: (1) the conflict in defendants' respective positions at trial, to the extent there was any, was minimal; (2) defendants were not each claiming the other was the guilty party; and (3) this defendant failed to show that he was deprived of a fair trial.

**13. Appeal and Error— preservation of issues—failure to argue**

Assignments of error that defendants have not argued in their briefs are deemed abandoned under N.C. R. App. P. Rule 28(b)(6).

Appeal by defendants from judgment entered 15 August 2003 by Judge Jay D. Hockenbury in New Hanover County Superior Court. Heard in the Court of Appeals 1 February 2005.

*Attorney General Roy Cooper, by Assistant Attorneys General William B. Crumpler and Christopher W. Brooks, for the State.*

*Brian Michael Aus, for defendant-appellant Bellamy.*

*Daniel Shatz, for defendant-appellant McCoy.*

STEELMAN, Judge.

The robbery of an individual of her own property and the property of her employer, occurring at the same time, constitutes only one offense of robbery with a dangerous weapon. A sex offense committed in the course of a robbery of a public business by a robber was not a natural or probable consequence of the robbery. The conviction of the co-defendant on the theory of acting in concert must be reversed.

On 23 September 2002, C.B. was working the evening shift as the assistant manager of a McDonald's at Long Leaf Mall in Wilmington. On her crew during the shift were defendant Leon McCoy (McCoy) and Andre Randall (Randall), who frequently worked together on the same shift. C.B. closed the lobby and locked the doors at 10:00 that night, though the drive-thru window remained open until 11:00. Ordinarily McCoy took out the trash, however on that night Randall took it out, and, contrary to policy, failed to notify C.B. that he was doing so. The manager should have opened and shut the locked door for Randall, however Randall simply turned the deadbolt in a way that

kept the door ajar. It was through this open door that an armed assailant entered at around 11:30, as McCoy was mopping the hallway and C.B. was preparing the night deposit. The assailant went into the office and put a gun to the side of C.B.'s head. He wore a green ski mask, but she could tell it was a black male who was about her height. He demanded the deposit money, and also took C.B.'s personal cash. He demanded a bag for the cash. McCoy, who was lying on the floor outside the office, went to the front near the service counter and got a bag. Though there were several silent alarms in this area, McCoy did not activate any of them.

Once he bagged the money, the robber told C.B. to undress. As she was unbuttoning her shirt, he said it was taking too long and he told her to just drop her pants and underwear. He then demanded that she spread her labia apart. He stooped down to inspect her genitals, and used the barrel of his gun to pull her labia further apart. He noticed that she had a tampon inserted, and told her that she was "lucky". The assailant then departed with the money. After the assailant left, McCoy went to the front of the store and hit a silent alarm.

McCoy and Randall often rode to work together. At trial, Randall testified that: He saw no one outside as he took out the trash that night, but he did see a white Mitsubishi Galant in the parking lot. Defendant Keith Lamar Bellamy (Bellamy) owned a burgundy Honda automobile, but at the time of the robbery he was driving his cousin's 1995 white Mitsubishi Galant. Bellamy and McCoy knew each other and were friends. Randall knew Bellamy from seeing him around the neighborhood and from playing basketball with him. McCoy was having financial problems before the robbery. McCoy lived in a boarding house and at times would be late with his rent and get locked out of his room. McCoy was upset about his work hours being cut because he was not going to have enough money to pay his rent. A few weeks before the robbery, Randall learned that McCoy was contemplating robbing the McDonald's. A couple of days before the robbery, having been locked out of his room for non-payment, McCoy spoke more specifically about robbing the McDonald's to get money to pay his rent. McCoy was looking for Bellamy to help him commit the robbery. He told Randall not to interfere with the robbery. A couple of days or so before the robbery, McCoy left work early. Around 11:30 p.m. that night, Randall saw McCoy and Bellamy in the parking lot in the burgundy Honda. Randall believed the robbery was supposed to have taken place that night, but was called off because of police presence

in the area. When Randall took the trash out on the night of the robbery and saw the white Galant in the parking lot, he knew it was Bellamy. Upon reentering the restaurant, Randall encountered a person wearing a green mask. The person pointed a gun at Randall's head and told him to get down on the floor. Randall recognized the robber's voice as Bellamy's.

Detective Overman of the Wilmington Police Department arrived at McDonald's about 12:20 a.m. McCoy told him that he could not identify the perpetrator's voice. He said the robber pointed the gun directly at him and ordered him to lie down immediately when the robber entered the restaurant. The assertion that McCoy was immediately ordered to the floor was contradicted by videotapes, which showed the office, hall, and kitchen area of the McDonald's during the robbery.

Randall and McCoy left McDonald's together, before 1:58 a.m. According to Randall, McCoy asked Randall to take him to where Bellamy lived, and used Randall's cell phone to call Bellamy's residence but no one answered. Phone records showed a call from Randall's phone to that residence at 1:58 a.m. McCoy said he needed to find Bellamy, and directed Randall to drop him off at a location where he thought Bellamy might be located. Randall testified that within a few days of the robbery, McCoy offered him $400 not to say anything to the police about the robbery and his role in it. He attempted to hand the money to Randall, but Randall refused.

A store near the McDonald's, Pets Plus, had a surveillance system with a camera that faced in the direction of McDonald's. The videotape shows a light colored car leaving the area around the time the assailant left the McDonald's. The assailant had a handgun that appeared to be a .45 caliber automatic. During a search of Bellamy's residence in Wilmington on 14 November 2002, six .45 caliber bullets were found in his jacket. Police also found a lockbox containing fifty twenty dollar bills. On 31 October 2002 in Wilmington, Bellamy fled from the police in his burgundy Honda and subsequently escaped on foot. The police found a green ski mask in the far right side of the trunk of the Honda. Another green ski mask was found in the trunk under a computer monitor.

Sgt. Dean Daniels of the New Hanover County Sheriff's Department had known Bellamy since 1992. He was familiar with Bellamy's walk, dress and mannerisms. He reviewed the McDonald's videotapes and observed that the perpetrator walked and dressed

in a manner similar to Bellamy, and also used his hands similarly to Bellamy when talking.

Defendants were tried before a jury in New Hanover County Superior Court, and were found guilty of all charges on 15 August 2003. Bellamy was convicted of two counts of robbery with a dangerous weapon, which were consolidated for judgment, and first-degree sexual offense. The two sentences were ordered to run consecutively, and resulted in a total active prison sentence of 439 months to 546 months. McCoy was convicted of two counts of robbery with a dangerous weapon and one count of first-degree sexual offense, which were consolidated for judgment, resulting in an active prison term of 307 months to 378 months. From these judgments each defendant appeals.

## Defendants' Joint Arguments on Appeal

In Bellamy's fifth argument, and McCoy's first argument, they contend that the trial court erred in denying their motions to dismiss. We agree in part.

Both defendants argue that the State failed to establish by sufficient evidence that there were two distinct robberies supporting two robbery convictions for each defendant, and that the State failed to present sufficient evidence to support the element of penetration needed to prove first-degree sexual offense.

"When a defendant moves for dismissal, the trial court is to determine whether there is substantial evidence (a) of each essential element of the offense charged, or of a lesser offense included therein, and (b) of defendant's being the perpetrator of the offense. If so, the motion to dismiss is properly denied." *State v. Earnhardt*, 307 N.C. 62, 65-66, 296 S.E.2d 649, 651-52 (1982). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Id.* at 66, 296 S.E.2d at 652.

[1] The defendants argue that the trial court erred in failing to dismiss one of the charges of robbery with a dangerous weapon against each of them. The defendants were both charged with two counts of robbery with a dangerous weapon, one count for robbing C.B. personally, and one count for robbing McDonald's. The State concedes, and we agree, that one of the judgments for robbery with a dangerous weapon against each defendant should have been arrested by the trial court because there was only one robbery with a dangerous weapon. This Court, commenting on *State v. Beaty*, 306 N.C. 491, 293 S.E.2d

760 (1982) (citation omitted), *overruled on different grounds, State v. White*, 322 N.C. 506, 369 S.E.2d 813 (1988), stated:

> In *Beaty*, there were two indictments for armed robbery arising out of the assault of a single employee, during which assault property was taken from both the employee and the business. The *Beaty* Court stated that, "[t]he controlling factor in this situation is the existence of a single assault," not the two sources (the store and the employee) from which the money was taken. The fact there were two indictments was deemed irrelevant. The Court therefore concluded only one armed robbery had occurred.

*State v. Suggs*, 86 N.C. App. 588, 596, 359 S.E.2d 24, 29 (1987). We therefore arrest judgment on 02 CRS 23396, one count of robbery with a dangerous weapon against Bellamy, and we arrest judgment on 02 CRS 23435, one count of robbery with a dangerous weapon against McCoy, and remand the cases of each defendant for resentencing.

**[2]** As to the convictions for first-degree sexual offense, we find that there was sufficient evidence of penetration for that charge to be submitted to the jury. N.C. Gen. Stat. § 14-27.4(a)(2)a. provides: "A person is guilty of a sexual offense in the first-degree if the person engages in a sexual act: With another person by force and against the will of the other person, and: Employs or displays a dangerous or deadly weapon . . . ." "Sexual act [can be defined as] the penetration, however slight, by any object into the genital or anal opening of another person's body . . . ." N.C. Gen. Stat. § 14-27.1(4). "N.C.G.S. § 14-27.1(4) requires only slight penetration of the genital opening." *State v. Watkins*, 318 N.C. 498, 502, 349 S.E.2d 564, 566 (1986).

Defendants argue that the evidence at trial was insufficient on the element of penetration to allow this charge to be submitted to the jury. We disagree.

C.B. testified at trial that the assailant ordered her to drop her pants and underwear at gunpoint and asked her to spread open her labia so he could inspect her vagina. The assailant then used the barrel of his gun to separate her labia. C.B. further testified that she "felt the gun up against my private area right where the tampon would be entered." She clarified this statement by adding: "He didn't shove the . . . barrel of the gun directly into me. However, I did feel the barrel of the gun, the force of it in the vicinity of the area where you would put the tampon in." She further clarified that she felt the barrel of the gun on the *inside* of her labia.

STATE v. BELLAMY

[172 N.C. App. 649 (2005)]

Our Supreme Court has held that in the context of rape, evidence that the defendant entered the labia is sufficient to prove the element of penetration. *State v. Johnson*, 317 N.C. 417, 434, 347 S.E.2d 7, 17 (1986), *superseded by statute as stated in*, *State v. Moore*, 335 N.C. 567, 440 S.E.2d 797 (1994). We find no reason to establish a different standard for sexual offense. We hold that all of the evidence in the instant case shows that Bellamy used the barrel of his gun to spread the labia of C.B. This evidence supported the element of penetration for the first-degree sexual offense. The trial court properly denied the motions of the defendants to dismiss this charge, on this basis.

[3] In Bellamy's first argument, and McCoy's fifth argument, they contend that the trial court erred in admitting into evidence a video from Pets Plus because the State was unable to authenticate it as "accurately depicting anything which was relevant to any issue in the case." We disagree.

McCoy adopts the argument of Bellamy on this issue. Defendants argue that the video was improperly admitted on three grounds: 1) the video was not properly authenticated, 2) the video did not accurately portray the events of that evening, and 3) the video was unduly prejudicial. We first note that neither defendant objected at trial to the admission of the Pets Plus video on the grounds that it was unduly prejudicial. The defendants did not object to the admission of the video for illustrative purposes. They did object to the admission of the video into evidence for substantive purposes based on a lack of proper authentication, arguing it did not accurately portray the events of that night, and that it was irrelevant to the case. The trial court overruled their objections.

Because the defendants did not object to the admission of the video at trial on the grounds that its probative value was outweighed by its prejudicial effect (North Carolina Rules of Evidence Rule 403), and because they do not argue on appeal that the prejudicial effect of the video was such as to amount to plain error, any argument that the video should have been excluded under Rule 403 is not properly before us. *State v. Flippen*, 349 N.C. 264, 274-75, 506 S.E.2d 702, 709 (1998).

Defendants argue that the trial court violated North Carolina Rules of Evidence Rule 901(a) by admitting the video tape in question. Rule 901(a) states: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is

what its proponent claims." This Court has established a four-pronged test addressing the admissibility of a videotape:

> The prerequisite that the offeror lay a proper foundation for the videotape can be met by: (1) testimony that the motion picture or video tape [sic] fairly and accurately illustrates the events filmed (illustrative purposes); (2) "proper testimony concerning the checking and operation of the video camera and the chain of evidence concerning the videotape . . ."; (3) testimony that "the photographs introduced at trial were the same as those [the witness] had inspected immediately after processing," (substantive purposes); or (4) *"testimony that the videotape had not been edited, and that the picture fairly and accurately recorded the actual appearance of the area 'photographed.' "*

*State v. Mewborn*, 131 N.C. App. 495, 498, 507 S.E.2d 906, 909 (1998) (quoting *State v. Cannon*, 92 N.C. App. 246, 254, 374 S.E.2d 604, 608 (1988), *rev'd on other grounds*, 326 N.C. 37, 387 S.E.2d 450 (1990)). In *Mewborn*

> The state offered testimony from Tonya Jenkins and Sergeant Harrell of the Kinston Police Department that the camera, VCR, and monitor in the Mallard Food Store were operating properly on the day of the robbery. Sergeant Harrell testified that he watched the tape shortly after his arrival at the crime scene. Realizing that it depicted the robbery, Harrell showed the tape to Lieutenant Boyd of the Kinston Police Department when she arrived at the store. Lieutenant Boyd then followed standard procedures to safeguard the tape as evidence. At trial, during *voir dire* outside the jury's presence, Lieutenant Boyd stated that the images on the tape had not been altered and were in the same condition as when she had first viewed them on the day of the robbery. Because Lieutenant Boyd viewed the tape on both the day of the robbery and at trial and testified that it was in the same condition and had not been edited, there is little or no doubt as to the videotape's authenticity. When taken as a whole, the testimony of Boyd, Harrell, and Jenkins satisfy the test enunciated in *Cannon*.

*Mewborn*, 131 N.C. App. at 498-99, 507 S.E.2d at 909. In the instant case the State presented testimony establishing that the video recorder was in working order; that it was recording the night in question; that it was viewed the following day; that it had not been altered prior to trial; and that the chain of custody had not been bro-

ken. The video tape was properly authenticated, and accurately portrayed the events within its field of view on the night in question.

Though defendants argued at trial that the video should have been excluded for lack of relevance, they do not specifically address that argument in their briefs. We note, however, that the video shows a light colored vehicle passing in front of the Pets Plus store on the night in question, around the time that the perpetrator of the robbery would have been fleeing the scene. The vehicle bore a resemblance to the vehicle which Bellamy drove away from the scene of the robbery. This video was relevant evidence potentially corroborating Randall's testimony. It was the province of the jury to determine what weight, if any, to give to that evidence. The trial court properly admitted the video as corroborative and substantive evidence. These arguments are without merit.

**[4]** In Bellamy's second argument, and McCoy's fourth argument, they contend that the trial court committed error or plain error in allowing Detective Overman to narrate the videos shot inside the McDonald's at the time of the crime, and in allowing him to express his opinion regarding the significance of the events depicted. We disagree.

We first note that though defendants contend testimony by Sergeant Dean Daniels of the New Hanover County Sheriff's Department that he believed the masked man in the video was Bellamy constituted error, neither defendant has assigned Sergeant Daniels' testimony as error in the record as required by Rule 10(a) of the North Carolina Rules of Appellate Procedure, and thus they have not preserved this argument for appellate review. *State v. White*, 82 N.C. App. 358, 360, 346 S.E.2d 243, 245 (1986).

Defendants list thirty-nine specific instances where they contend Detective Overman's testimony constituted plain error. Assuming *arguendo* that it was error to allow Detective Overman to narrate the video footage, and that each instance of testimony defendants complain of constitutes improper opinion testimony, we find no prejudicial error. *State v. McElroy*, 326 N.C. 752, 756, 392 S.E.2d 67, 69 (1990).

Of the thirty-nine separate instances of testimony complained of, defendants only objected to three, and one of these objections was sustained. Of the remaining two, Bellamy objected once, and McCoy objected once. Upon objection,

[a] defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. The burden of showing such prejudice under this subsection is upon the defendant.

N.C. Gen. Stat. § 15A-1443(a) (2003); *McElroy*, 326 N.C. at 756, 392 S.E.2d at 69. Bellamy objected to the following question and answer concerning a chair that the gunman positioned in a way that obstructed his exit:

Q. Why is the position of this chair significant in this particular investigation to you?

A. You would think that the suspect would want a clear line— [of flight.]

MR. DAVIS: Objection to what 'you would think', your honor.

In light of the substantial evidence presented at trial indicating Bellamy's guilt, much of which we have related above, we hold there is no reasonable possibility that the jury would have reached a different verdict had this evidence been excluded.

McCoy objected to the following testimony by Detective Overman:

At the beginning of this cement median there started a trail of money, one-dollar bills. And they extended from right before the median, through the median, headed in a southerly direction. $40, I believe, is what was recovered. It indicated to me that the suspect [Bellamy] took his time getting every cent from the interior of the office. He appeared, you know, concerned about getting every cent. I couldn't understand why he left $40 lying on the ground out here unless he was hearing some type of alarm go off and he was concerned about the police being in route.

This testimony concerns Bellamy, and could only prejudice McCoy if there is a reasonable possibility that it caused the jury to reach a different verdict for Bellamy, thus supporting McCoy's conviction based on acting in concert. We hold that McCoy fails to meet his burden concerning this testimony, which merely states Detective Overman's opinion that the suspect wanted to get "every cent" and must have been aware that the police were *en route*.

The remaining thirty-six instances complained of by defendants were not objected to and are thus subject to plain error analysis. Where, as here, defendant contests separate admissions of evidence under the plain error rule, each admission will be analyzed separately for plain error, not cumulatively. *State v. Riley*, 159 N.C. App. 546, 550-51, 583 S.E.2d 379, 383 (2003); *State v. Holbrook*, 137 N.C. App. 766, 768-69, 529 S.E.2d 510, 511-12 (2000).

Defendants argue that because the trial court repeatedly over-ruled their objections, further objection was futile and this Court should evaluate all of the contested to testimony under N.C. Gen. Stat. § 15A-1443(a) analysis pursuant to *State v. Mills*, 83 N.C. App. 606, 612, 351 S.E.2d 130, 134 (1986). In *Mills*, this Court determined that a pattern of objections related to prior bad act evidence consti-tuted a continuing objection, and decided in its discretion to consider evidence admitted without objection. There is nothing in *Mills* indi-cating that the Court was required to consider this evidence cumu-latively. We decline to treat defendants' sparse and sometimes unrelated objections in the instant case as a continuing objection to all the contested evidence, and thus apply plain error analysis.

"The plain error rule applies only in truly exceptional cases." *State v. Walker*, 316 N.C. 33, 39, 340 S.E.2d 80, 83 (1986). "[T]he term 'plain error' does not simply mean obvious or apparent error . . . ." *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983). "[T]o reach the level of 'plain error' contemplated in *Odom*, the error . . . must be 'so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached.' " *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993) (citations omitted).

> In other words, the appellate court must determine that the error in question "tilted the scales" and caused the jury to reach its ver-dict convicting the defendant. Therefore, the test for "plain error" places a much heavier burden upon the defendant than that imposed by N.C.G.S. § 15A-1443 upon defendants who have pre-served their rights by timely objection. This is so in part at least because the defendant could have prevented any error by making a timely objection.

*Walker*, 316 N.C. at 39, 340 S.E.2d at 83. We have considered each piece of testimony individually, as we are required to do, and hold even assuming *arguendo* that all were improper, defendants have

failed in their burden of showing any of them rise to the level of plain error. These arguments are without merit.

**[5]** In Bellamy's eighth argument, and McCoy's third argument, they contend that the trial court committed plain error by allowing Detective Overman to vouch for Randall's credibility in his testimony. We disagree.

It is improper for one witness to vouch for the veracity of another. *State v. Robinson*, 355 N.C. 320, 334-35, 561 S.E.2d 245, 255 (2002). In the instant case, defendants argue that the trial court committed plain error by allowing Detective Overman to make four statements of his opinion regarding the credibility of Randall. Randall had testified earlier at trial that he had removed a key from a keypad next to the door when he returned from taking the trash out. The security video shows Randall doing something near the door after he re-entered the McDonald's. Detective Overman testified that this footage was significant because "it corroborates what he has to say. It shows me that he's telling the truth."

Assuming *arguendo* that this testimony was improper, we hold that it does not rise to the level of plain error. It is clear from the transcript that Detective Overman was simply stating that the video corroborated Randall's statements concerning his actions as he re-entered the restaurant; that he believed Randall had been truthful in that particular testimony. Detective Overman's statements do not suggest that he was of the opinion that Randall had been truthful in all of his testimony; specifically in his statements directly implicating the defendants in the crimes.

In fact, Detective Overman explicitly testified that he had doubts about Randall: that he felt Randall was holding something back, and that he still considered Randall a suspect. In light of this testimony questioning Randall's truthfulness, we hold that when considering all the evidence, any error in the admission of the complained of testimony does not rise to the level of plain error. Defendants further argue plain error in Detective Overman's testimony that 1) cell phone records corroborated Randall's statements that McCoy used his cell phone after the robbery to call Bellamy; 2) the video from Pets Plus corroborated Randall's statements concerning a white Mitsubishi Gallant he claimed to have seen in the parking lot just before the robbery, and 3) the statement that without Randall "and the information he was giving me, this investigation never would have been solved." Assuming *arguendo* these statements were improperly admitted, we

hold that they do not rise to the level of plain error. This argument is without merit.

[6] In Bellamy's seventh argument, and McCoy's sixth argument, they contend that the trial court erred or committed plain error in admitting over objection certain physical evidence at trial. We disagree.

Defendants argue that the trial court erred in admitting $1000.00 in cash found in Bellamy's residence, and two green ski masks found in Bellamy's car. Defendants admit that they did not object at trial to the admission of the $1000.00, but contend that they did object to the admission of the ski masks. Our review of the record indicates that defendants objected initially to the admission of a photograph of the two masks. The trial court allowed the witness (C.B.) to look at the photo and testify whether the masks were similar to the one worn by the gunman during the robbery, but the State was not allowed to admit the photo as evidence at that time. Defendants did not object to the later introduction of the photograph for illustrative purposes, nor did they object to the admission of the actual ski masks. Therefore, defendants have not preserved this issue for normal appellate review, and we are limited to plain error analysis for the admission of both the $1000.00 and the masks. *State v. Parker*, 350 N.C. 411, 427, 516 S.E.2d 106, 118 (1999).

Assuming *arguendo* that the items were improperly admitted, defendants make no argument on appeal as to how the admission of these items of evidence has prejudiced them in any way. It is the defendants' burden in plain error analysis to prove that the jury "probably would have reached a different verdict" absent the error. *State v. Riley*, 159 N.C. App. 546, 551, 583 S.E.2d 379, 383 (2003) (citations omitted). Defendants fail to carry this burden.

[7] McCoy also argues that the trial court erred in denying his request that an instruction be given limiting the jury's consideration of this evidence to Bellamy, since the evidence was recovered from Bellamy. Though McCoy requested a limiting instruction with regard to the photograph of the two masks, he did not request such an instruction for the admission of the actual masks or the $1000.00. McCoy does not argue on appeal that the trial court committed plain error by failing to give a limiting instruction *ex mero motu*, thus this issue has not been properly preserved on appeal. *State v. Cummings*, 352 N.C. 600, 636, 536 S.E.2d 36, 61 (2000), *cert. denied, Cummings v. North Carolina*, 532 U.S. 997, 149 L. Ed. 2d 641 (2001). This argument is without merit.

## Defendant Bellamy's Appeal

[8] In Bellamy's sixth argument he contends that the trial court committed plain error in failing to instruct the jury on any lesser included offenses to first-degree sexual offense. We disagree.

Because Bellamy did not request an instruction on any lesser included offense, our review of this issue is limited to plain error. *State v. Collins*, 334 N.C. 54, 61, 431 S.E.2d 188, 193 (1993). Our Supreme Court has stated "that to reach the level of 'plain error' . . . the error in the trial court's jury instructions must be 'so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached.' " *Id.* at 62, 431 S.E.2d at 193.

Bellamy argues that the trial court should have instructed the jury on the lesser included offenses of assault on a female and attempted first-degree sexual offense. We first note that assault on a female is not a lesser included offense of first-degree sexual offense. *State v. Bagley*, 321 N.C. 201, 210, 362 S.E.2d 244, 249 (1987). Therefore, our analysis is limited to attempted first-degree sexual offense. Bellamy presented no evidence at trial. Generally, when there is no evidence that the sexual offense was not accomplished, the court has no duty to instruct on an attempted sexual offense. *State v. Hensley*, 91 N.C. App. 282, 284, 371 S.E.2d 498, 499 (1988).

Bellamy argues that C.B.'s testimony was equivocal, and that the State's evidence could allow a jury to find that there was no penetration, and that he was guilty of the lesser offense of attempted first-degree sexual offense. As we discussed above, all of the evidence showed that Bellamy used the barrel of his gun to spread the labia of C.B. This constituted the penetration of C.B.'s vagina, and thus the sexual offense was completed. The trial court was not required to submit attempted first-degree sexual offense to the jury as a lesser offense, and thus committed no error and no plain error. This assignment of error is without merit.

[9] In Bellamy's third argument he contends that his conviction should be overturned because the State allowed Detective Overman to give testimony it knew to be false and did not correct it. We disagree.

"When a defendant shows that 'testimony was in fact false, material, and knowingly and intentionally used by the State to obtain his conviction,' he is entitled to a new trial." *State v. Sanders*, 327 N.C.

319, 336, 395 S.E.2d 412, 423 (1990) (citations omitted). Testimony is material in this context if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.*, 395 S.E.2d at 424, *quoting United States v. Augurs*, 427 U.S. 97, 103, 49 L. Ed. 2d 342, 349-50 (1976).

In Bellamy's assignments of error, he argues that Detective Overman submitted false testimony on three separate occasions, each involving his observations of the videotape evidence. We first note that the danger from which this rule seeks to protect defendants is the intentional misleading of the jury through the introduction of false evidence. Where, as here, judge, jury, and defendants (including their counsel) all had the opportunity to view the video themselves, the possibility of misleading the jury, (and thus affecting the outcome of the trial) must necessarily be slight. Further, it is exceedingly unlikely that the State would intentionally proffer false evidence in a situation where the falsity of the evidence could be easily discovered.

First, Bellamy challenges testimony that a white Mitsubishi Gallant was recorded on videotape passing in front of the Pets Plus store at around the time the masked gunman was fleeing the McDonald's. Detective Overman admitted at trial that he could not be certain the car was a white Gallant. Therefore, even if the car was not a white Gallant, Detective Overman's testimony when read in full was not false. Second, Bellamy challenges testimony that the masked gunman had his finger off the trigger when he was aiming the gun at McCoy and ordering him to the ground, and that the masked gunman in the video had distinctive fingernails similar to those of Bellamy. Bellamy argues that the video was not of sufficient quality for Detective Overman to make these observations. We hold that, even assuming *arguendo* the testimony was false, Bellamy fails in his burden of proving the evidence was material and knowingly and intentionally used by the State to obtain his conviction.

Bellamy's only remaining argument in this regard is that it should have been obvious to the State that the above testimony by Detective Overman was false because it reviewed the video, and the video is of insufficient quality to make such a determination. If the video is of insufficient quality, then it would have also been obvious to the jury that Detective Overman was over-reaching in his testimony, and thus there is no reasonable likelihood that the false testimony could have affected their decision. Further, we do not find this evidence sufficient to prove that the State knowingly and intentionally allowed this

testimony to go uncorrected in order to obtain a conviction. This argument is without merit.

**[10]** In Bellamy's fourth argument he contends that the trial court committed plain error by permitting Detective Overman to testify regarding Bellamy's prior arrests.

At trial Detective Overman testified that in response to statements from Randall that he believed the voice of the masked gunman belonged to a man he knew as "Keith," Detective Overman conducted a search of the police database, and turned up a photo of Bellamy. Detective Overman testified to the method he used to put together a photographic line-up, and further testified that he showed the line-up to Randall, and that Randall identified the photo of Bellamy as the man he believed robbed the McDonald's.

Bellamy argues that this testimony was improper and requires a reversal of his conviction because it allowed the jury to infer that he had prior arrests. Our appellate courts have held on similar facts that when evidence is admitted for a proper purpose, the fact that the evidence may have allowed the jury to infer that the defendant had a prior arrest does not require a new trial. *See State v. Jackson*, 284 N.C. 321, 331-35, 200 S.E.2d 626, 633-35 (1973). We hold that this testimony was not improper. Further, assuming *arguendo* that it was improper, we hold that the admission of this testimony does not rise to the level of plain error.

## Defendant McCoy's Appeal

**[11]** In McCoy's first argument, he contends that the trial court erred in denying his motion to dismiss the charge of first-degree sexual offense. At trial, the State proceeded against McCoy on this charge under a theory of acting in concert. The State's theory at trial was that Bellamy was the masked gunman who actually robbed the McDonald's, and who perpetrated the sexual assault on C.B., but that McCoy was his inside help, and that they planned the robbery together. As a party to the robbery, the State contends that McCoy is liable as a principal under the theory of acting in concert for Bellamy's sexual assault on C.B.. The law of acting in concert in North Carolina is as follows:

> If "two persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal if the other commits that particular crime, but he is also guilty of any other crime committed by the other in pur-

suance of the common purpose . . . or as a natural or probable consequence thereof."

*State v. Barnes*, 345 N.C. 184, 233, 481 S.E.2d 44, 71 (1997), *quoting State v. Erlewine*, 328 N.C. 626, 637, 403 S.E.2d 280, 286 (1991) (quoting *State v. Westbrook*, 279 N.C. 18, 41-42, 181 S.E.2d 572, 586 (1971), *death sentence vacated*, 408 U.S. 939, 33 L. Ed. 2d 761 (1972)). In the instant case, the State did not argue at trial, and does not argue on appeal, that the sexual assault was done "in pursuance of the common purpose" of the robbery with a dangerous weapon. The record is completely devoid of evidence that the defendants discussed any potential sexual assault prior to the robbery. The State argues that the sexual assault was "a natural or probable consequence thereof." Whether a sexual assault is a natural or probable consequence of a robbery with a dangerous weapon of a fast food restaurant is a question of first impression in North Carolina.

The State asserts that any sexual assault perpetrated in the course of any robbery with a dangerous weapon is a natural or probable consequence thereof. Clearly, a murder committed during the course of a robbery with a dangerous weapon is normally a natural or probable consequence of that robbery with a dangerous weapon. *See State v. Dudley*, 151 N.C. App. 711, 714, 566 S.E.2d 843, 846 (2002). Conversely, a murder to conceal a previous arson might not be such a consequence. *See Everritt v. State*, 588 S.E.2d 691, 693 (Ga. 2003). The question is one of foreseeability: if one takes the property of another at the point of a loaded gun, the violent use of that gun is a foreseeable consequence. *See United States v. Johnson*, 730 F.2d 683, 690 (11th Cir. 1984); *Everritt*, 588 S.E.2d 691; *People v. Hickles*, 56 Cal. App. 4th 1183, 1193-94 (Cal. Ct. App., 1997); *State v. Linscott*, 520 A.2d 1067, 1069-70 (Me. 1987). Some jurisdictions have determined that whether a consequence of a robbery with a dangerous weapon was natural or probable is judged by an objective standard. *See People v. Nguyen*, 21 Cal. App. 4th 518, 531, 26 Cal. Rptr. 2d 323, 331 (1993) ("the issue does not turn on the defendant's subjective state of mind, but depends upon whether, under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the" principal crime).

Our Supreme Court has expressly rejected the concept that for a defendant to be convicted of a crime under an acting in concert theory, he must possess the *mens rea* to commit that particular crime. *Barnes*, 345 N.C. 184, 481 S.E.2d 44 (overruling *State v.*

*Blankenship*, 337 N.C. 543, 447 S.E.2d 727 (1994) and *State v. Straing*, 342 N.C. 623, 466 S.E.2d 278 (1996)). Based upon the holding in *Barnes*, it would not be appropriate to adopt a standard based upon the defendant's subjective state of mind or intent. Rather, the appropriate standard for evaluating whether a crime was a reasonable or probable consequence of a defendant's joint purpose should be an objective one.

We decline to adopt a *per se* rule that any sexual assault committed during the course of a robbery is a natural or probable consequence of a planned crime. Rather, this determination must be made on a case by case basis, upon the specific facts and circumstances presented. *See State v. Trackwell*, 458 N.W.2d 181, 183-84 (Neb. 1990). The issue in the instant case is whether the sex offense Bellamy committed was a natural or probable consequence of the robbery with a dangerous weapon of the McDonald's.

> "Natural" has many meanings, but the most apposite dictionary definition is "in accordance with or determined by nature." A natural consequence is thus one which is within the normal range of outcomes that may be expected to occur if nothing unusual has intervened. We need not define "probable," except to note that, even standing alone, this adjective sets a significantly more exacting standard than the word "possible." Accordingly, if we accord to the words of our cases their ordinary every-day meaning, it is not enough for the prosecution to show that the accomplice knew or should have known that the principal might conceivably commit the offense which the accomplice is charged . . . .

*Roy v. United States*, 652 A.2d 1098, 1105 (D.C. 1995); *see also Howell v. State*, 339 So. 2d 138, 140 (Ala. Crim. App. 1976).

Concerning the foreseeability of robbery turning into a sexual offense, the California Court of Appeals has stated:

> Robbery is a crime that can be committed in widely varying circumstances. It can be committed in a public place, such as on a street or in a market, or it can be committed in a place of isolation, such as in the victim's home. It can be committed in an instant, such as in a forcible purse snatching, or it can be committed over a prolonged period of time in which the victim is held hostage. During hostage-type robberies in isolated locations, sexual abuse of victims is all too common. . . . "When robbers enter

STATE v. BELLAMY

[172 N.C. App. 649 (2005)]

the home, the scene is all too often set for other and more dreadful crimes such as that committed on [the victim] in this case. In the home, the victims are particularly weak and vulnerable and the robber is correspondingly secure. The result is all too often the infliction of other crimes on the helpless victim. Rapes consummated during the robbery of a bank or supermarket appear to be a rarity, but rapes in the course of a residential robbery occur with depressing frequency."

*Nguyen*, 21 Cal. App. 4th at 532-33 (internal citation omitted). In the *Nguyen* case, the California Court of Appeals held that though in general a sexual assault in the course of an robbery of a business would not be foreseeable, on particular facts it could be. Specifically, they held that a sexual assault was a natural or probable consequence of a robbery where:

The defendants and their cohorts chose to commit robberies in businesses with a sexual aura, both from the types of services they held themselves out as providing and from the strong suspicion, repeatedly expressed by the participants at the trial, that they were actually engaged in prostitution. The businesses were arranged much like a residence, with separate rooms furnished as bedrooms might be. The businesses operated behind locked doors, which both added to their sexual aura and gave the robbers security against intrusion or discovery by outsiders. The robbers went to the businesses in sufficient numbers to easily overcome any potential resistance and to maintain control over the victims for as long as they desired.

*Id.* at 533. We agree that in certain factual circumstances a sexual assault in the course of a robbery of a business may be a natural or probable circumstance, but that it is less likely to be so than in the context of a robbery taking place in a home.

In the instant case, Bellamy entered McDonald's at around 11:30 at night. Though that particular McDonald's was closed (the interior closed at 10:00 p.m. and the drive-thru closed at 11:00 p.m.), in light of the fact that many McDonald's stay open later than 11:30 p.m., it would not be unusual for prospective customers to arrive at or after 11:30. The very public nature of a fast food restaurant creates a significant risk that the masked gunman or the employees lying on the floor inside might be noticed by someone outside. This is a fact of which McCoy, as an employee, would have been well aware. McCoy

was also aware that there were security cameras in the store recording events during the robbery, and that there were silent alarms which other employees might have activated before Bellamy obtained control of the employees. In light of these facts, a reasonable person in McCoy's position would expect Bellamy to get in and out of the restaurant as quickly as possible to avoid capture or recognition. On these facts, and in this kind of a public business, we cannot find that a reasonable person in McCoy's position would have foreseen that Bellamy would take the time to deviate from the planned robbery to commit this type of bizarre sexual assault on C.B. It was the State's burden to prove beyond a reasonable doubt that this sexual assault was a natural and probable result of the robbery with a dangerous weapon, and it has failed to meet this burden. The trial court erred in failing to dismiss the first-degree sexual offense charge against McCoy. We reverse judgment on the conviction under 02 CRS 23434 and remand McCoy's case to the trial court for resentencing on a single count of robbery with a dangerous weapon.

[12] In McCoy's seventh argument he contends that the trial court erred in joining Bellamy's and McCoy's cases for trial, and in denying McCoy's motions to sever. We disagree.

> N.C.G.S. § 15A-926(b)(2)(a) provides for joinder of defendants where, as here, the State seeks to hold each defendant accountable for the same offenses. The propriety of joinder depends upon the circumstances of each case and is within the sound discretion of the trial judge. "Absent a showing that a defendant has been deprived of a fair trial by joinder, the trial judge's discretionary ruling on the question will not be disturbed." *State v. Nelson*, 298 N.C. 573, 586, 260 S.E.2d 629, 640 (1979), *cert. denied sub nom. Jolly v. North Carolina*, 446 U.S. 929, 64 L. Ed. 2d 282, 100 S. Ct. 1867 (1980).

*State v. Pickens*, 335 N.C. 717, 724, 440 S.E.2d 552, 556 (1994). "The test is whether the conflict in defendants' respective positions at trial is of such a nature that, considering all of the other evidence in the case, defendants were denied a fair trial. G.S. 15A-927(c)(2)." *State v. Nelson*, 298 N.C. 573, 587, 260 S.E.2d 629, 640 (1979).

> In the instant case,

> the events from which all defendants were charged clearly were part of the same transaction and were so closely connected that

it would be difficult to separate proof of one charge from proof of the others. *We perceive no unfairness in the conduct of defendant's trial* with his co-defendants. Thus, there is no error in the joinder for trial of all defendants.

*State v. Melvin,* 57 N.C. App. 503, 505, 291 S.E.2d 885, 887 (1982) (emphasis added). The conflict in defendants' respective positions at trial, to the extent there was any, was minimal. Defendants were not each claiming the other was the guilty party as may often occur when two defendants are tried for the same crimes. In this case both defendants claimed that they were innocent individually, and neither accused the other of a crime. Though McCoy argues in his brief that certain evidence prejudicial to him was admitted at trial that would not have been admitted had the trials been severed, we have either determined that the contested evidence did not prejudice McCoy, or that McCoy has failed to properly preserve objection to the evidence and it is therefore not before us for consideration. We hold that defendant has failed to show that he was deprived of a fair trial by joinder, therefore, the trial judge's discretionary ruling on the question will not be disturbed. This argument is without merit.

**[13]** Because defendants have not argued their other assignments of error in their briefs, these assignments of error are deemed abandoned. N.C. R. App. P. Rule 28(b)(6) (2003).

NO ERROR IN PART, REVERSED AND REMANDED IN PART.

AS TO DEFENDANT BELLAMY, JUDGMENT ARRESTED ON ONE COUNT OF ROBBERY WITH A DANGEROUS WEAPON (02 CRS 23396), REMANDED FOR RESENTENCING.

AS TO DEFENDANT McCOY, JUDGMENT ARRESTED ON ONE COUNT OF ROBBERY WITH A DANGEROUS WEAPON (02 CRS 23435), CONVICTION FOR FIRST-DEGREE SEXUAL OFFENSE REVERSED, REMANDED FOR RESENTENCING.

Judges WYNN and HUDSON concur.